IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID IVERSON,                          )
                        Plaintiff,      )
                                        )
        vs.                             )  Civil Action No. 11-1108
                                        )
                                        )  Judge Terrence F. McVerry
CAPT. W. LEGGETT; JOHN                  )  Magistrate Judge Maureen P. Kelly
ALBRIGHT; LT. W. TIFT,                  )
                        Defendants.     )  Re: ECF Nos. 80, 89

**REPORT AND RECOMMENDATION**

I.      **RECOMMENDATION**

        Plaintiff David Iverson ("Iverson" or "Plaintiff") has filed this pro se civil rights action

against various corrections officers employed by the Pennsylvania Department of Corrections

("DOC") alleging that his constitutional rights were violated in the course of his incarceration

and transfer from the State Corrections Institution at Fayette ("SCI – Fayette") to the State

Corrections Institution at Camp Hill ("SCI – Camp Hill").   At this stage of the litigation,

Plaintiff's remaining claims arise out of (1) the continuation of certain disciplinary restrictions

during his transfer from SCI – Fayette to SCI – Camp Hill; and, (2) the use of metal chain waist

restraints for a period of 48 – 50 hours while placed in a cold cell without blankets, socks or

shoes.

        Discovery is complete. Plaintiff has filed a Motion for Partial Summary Judgment as to

his conditions of confinement, excessive force and equal protection claims. Defendants have

filed a Motion for Summary Judgment as to all claims and the parties have filed statements of

undisputed facts, briefs and exhibits in support and opposition thereto. [ECF Nos.  80 – 83; 89 –

92, 97-100].   As more fully explained below, the evidence adduced to date establishes that there are no genuine issues of material fact and that Defendants are entitled to the entry of judgment in their favor as a matter of law.   Accordingly, it is respectfully submitted that Iverson's Motion for Partial Summary Judgment [ECF No. 80] be denied and Defendants' Motion for Summary Judgment [ECF No. 89] be granted.

## II.    REPORT

### A.    PROCEDURAL AND FACTUAL BACKGROUND

#### 1. Procedural History

Plaintiff commenced this action on August 11, 2011, with the filing of his original Complaint at Civil Action No. 11-1483 in the United States District Court for the Middle District of Pennsylvania.   Plaintiff's original Complaint alleged claims against nine DOC supervisors and corrections officers employed at SCI – Fayette and two statewide DOC grievance officers arising out of his treatment at SCI – Fayette, a facility located within the jurisdiction of the United States District Court for the Western District of Pennsylvania.   [ECF No. 1].   Eleven days later, on August 22, 2011, Plaintiff filed an Amended Complaint alleging supplemental claims arising out of his treatment at SCI – Camp Hill, where Plaintiff was temporarily transferred for evaluation. [ECF No. 6].   The Amended Complaint identified four employees at SCI – Camp Hill and one employee at SCI – Fayette as newly named Defendants and alleged the violation of Plaintiff's constitutional rights arising out of unsanitary conditions of his cell at SCI – Camp Hill, a facility located within the jurisdiction of the United States District Court for the Middle District of Pennsylvania.   Plaintiff's Amended Complaint incorporated the original Complaint by reference as an attempt to join these supplemental claims.

The United States District Court for the Middle District of Pennsylvania concluded that Plaintiff's claims, as stated in his original Complaint, arose out of his confinement at SCI – Fayette. Accordingly, on August 30, 2011, the United States District Court for the Middle District entered an Order transferring the entirety of Plaintiff's action to the United States District Court for the Western District of Pennsylvania, where it deemed venue appropriate. However, the transfer Order did not consider the supplemental claims alleged in the Amended Complaint, which arose solely out of Plaintiff's confinement in a specific cell at SCI – Camp Hill. [ECF No. 13].

At the time of transfer, neither the original Complaint nor the Amended Complaint had been served on any named Defendant. Because of the existence of two complaints containing separate claims and parties, this Court entered an Order on October 11, 2011, requiring Plaintiff to file a Second Amended Complaint, naming all of the Defendants against whom he wished to proceed and setting forth all of the claims that he wished to bring against them in a single consolidated document. [ECF No. 19]. In response to a Motion to Strike for failing to comply with the Court's instructions, Plaintiff filed another Amended Complaint, which has been docketed as Plaintiff's Third Amended Complaint, and which has been designated as the operative complaint in this action. [ECF Nos. 48, 49, Order dated February 15, 2012].

Defendants filed a Partial Motion to Dismiss the consolidated Third Amended Complaint [ECF No. 50], seeking the dismissal or transfer of various claims which had been erroneously joined in this action, dismissal of claims patently expired under applicable statutes of limitations, and the dismissal of claims that were legally insufficient under facts alleged. Defendants' Partial Motion to Dismiss was granted in part and denied in part. Plaintiff's claims arising solely out of conditions at SCI – Camp Hill were transferred back to the United States District Court for the

Middle District of Pennsylvania and certain claims remain, outlined in an Order entered on November 28, 2012, as follows:

1. Claims against Defendants Albright and Leggett arising out of an incident which occurred on January 11-12, 2010. Such claims for those two days only are limited to: alleged retaliation in violation of the First Amendment to the United States Constitution; excessive use of force and "conditions of confinement" claims arising under the Eighth Amendment to the United States Constitution; a claim for the alleged violation of Plaintiff's rights to equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution; and, claims for assault and emotional distress arising under Pennsylvania state law; and,

2. Claims against Defendant Tift for an allegedly retaliatory transfer to SCI – Camp Hill with behavioral cell restrictions in place.

[ECF No. 75]. The remaining claims relative to Plaintiff's treatment during confinement at SCI-Fayette are the subject of the pending Motions for Summary Judgment.

## 2. Facts

Plaintiff is an inmate who has been incarcerated within the Pennsylvania DOC system since April 22, 2005, and is serving a 77 – 154 year sentence for, *inter alia,* Aggravated Assault. [ECF No. 92-4]. His behavioral history since his incarceration is marked by a lack of cooperation, manipulation and misconduct. Prior to entering a DOC facility, and while housed in the Philadelphia County Jail awaiting trial, Plaintiff committed an assault on a staff member and engaged in fighting with at least one other inmate. Since entering the DOC system, and as of January 12, 2011, Plaintiff has been found guilty of 65 misconducts including assaults and sexual misconduct and "has participated in several hunger strikes and play acted lower extremity paralysis in order to receive a transfer." [ECF No. 92-4]. During the period April 2005 through January 2011, Plaintiff spent only 537 days in General Population, with 2,443 days in disciplinary custody, and 268 of those days as a result of assaultive behavior. Id.

### a. January 2010 incident

The incident at issue spanned 48-50 hours over January 11-13, 2010, and began with Plaintiff's refusal to be handcuffed for a routine cell search, then blocking his cell window first with a mattress and then, after the removal of his mattress, again blocking his window with a "suicide smock" while threatening self-harm. Plaintiff alleges several claims against Defendants Albright and Leggett for eventually placing him in metal chain waist restraints[1] and then housing him in a "freezing cold cell" without a blanket, socks or shoes. The records and videos submitted by the parties reflect that the use of waist restraints was a last resort because of Plaintiff's persistent and escalating misconduct and threats of self-harm, including a threat to "fish" a razor and "finish the job."

Defendants have submitted a DVD containing video of the events leading up to Plaintiff's placement in restraints as well as video of the removal of the restraints. [ECF No. 92-6]. In addition, for the days at issue, Defendants have submitted documentation of Plaintiff's inmate adjustment records [ECF No. 92-2, pp. 61-66], medical incident/injury reports [ECF No. 92-2, pp. 77-88], and medical progress notes [ECF No. 92-7]. Plaintiff has also submitted medical records, which document the absence of injury from the use of the waist restraints, as well as the fact that use of waist restraints was continued for a full 48 -50 hours because of Plaintiff's threats of self-harm after an evaluation by a psychologist. [ECF No. 82-1, p. 1; 82-3, p. 1].

As evidenced from the discovery produced, the January 2010 incident began with Plaintiff's refusal to cooperate with a routine cell search. [ECF Nos. 81-5, 92-2, p. 42-44]. Defendant Leggett authorized a "Planned Use of Force" to conduct a strip search to ensure

---

[1] The metal belly restraints used were placed on Plaintiff's waist over a white t-shirt and consisted of a chain wrapped around twice around Plaintiff's waist with his handcuffs loosely attached to the chain.

Plaintiff was not hiding contraband or a weapon in his cell [ECF No. 92-2, pp. 42-43]. Plaintiff was removed from his cell with his cooperation, shackled at the ankles, handcuffed and led to a "strip-cage" where a visual search was conducted. After an uneventful search, Plaintiff was led to an observation cell. He was examined by medical staff after complaining that his ankles hurt and that he felt suicidal and then released into his cell. Plaintiff immediately lifted the mattress from the bed and covered the cell observation window. The extraction team returned to Plaintiff's cell and Plaintiff was cuffed again and led to the strip search cell to ensure he had not gained possession of any item that could be used in a suicide attempt. Plaintiff complied with a second strip search and was provided a "suicide smock," essentially a sleeveless neoprene hospital gown with Velcro fastenings. Plaintiff was returned to the observation cell; however, his mattress had been removed to prevent him from using it again block the window. After entering the cell, Plaintiff removed the "suicide smock" and covered his window, threatening that he would "fish" a razor and "do the same thing" he promised earlier. [ECF No. 92-6 00:25.29]

Plaintiff was extracted a third time, and again brought to the strip search cell. Because of his continued threats of self-harm and use of a mattress and clothing to cover his cell window, a decision was made to employ chain waist restraints. Plaintiff was cuffed, escorted to the strip cage; a third strip search was conducted to again ensure he had not come into possession of any item that could be used to harm himself or anyone else. After the visual search was completed, Plaintiff was provided a t-shirt and boxers and shoes. The chain waist restraints were then placed by Defendant Albright around Plaintiff's waist over his t-shirt and Plaintiff's hands were cuffed to the chain at his sides to prevent him from further harm and misbehavior. While Plaintiff alleges that Defendant Albright whispered racial epithets while applying the restraints

tightly, the video has excellent audio quality and no verbal taunts are heard.  Plaintiff was

provided instructions regarding the reason for the application of the waist restraints and informed

that his behavior would dictate when the restraints would be removed. Plaintiff complained that

he "couldn't breathe," so medical personnel checked the restraints to ensure they had been safely

applied.[2]  After checking the restraints, Plaintiff was covered with a coat and walked outside to

the LB cell block and housed in a psychiatric observation cell.  During the ten minutes that

passed after the restraints were checked, Plaintiff was calm, walked easily and did not voice any

additional complaints. [ECF No. 97-6].

Plaintiff was examined by medical personnel approximately ten times over the course of

the next 48-50 hours.  During the examinations, Plaintiff's restraints were checked, no

circulatory issues were noted, no injuries were identified and medical personnel were able to fit

two fingers between the restraints and Plaintiff's stomach.  Plaintiff refused to be seen by a nurse

at least once during the relevant time period.  [ECF No. 92-7, pp. 2-5; ECF No. 92-2, pp. 77-84].

Plaintiff's observation cell had a toilet, a flat metal shelf bed, no mattress or bedding, and

a door to self-contained recreation yard.  Plaintiff alleges that cold air entered the cell through

the door and that the cold temperatures of the cell "paralyzed" him and caused his body to "shut

down."  However, Plaintiff has not provided any evidence of the cell temperature, or evidence

that the heating system for the cell block was malfunctioning on the days in question.  Further,

there is no evidence that either Defendant Leggett or Defendant Albright were aware of any

issues regarding Plaintiff's cell temperature given that the door was insulated and the heating

system was in "good repair." [ECF No. 92-5, p. 9].  Plaintiff has provided the affidavits of three

---

[2] See, No. 92-2, p. 69; "RN Ranker stated he assessed Inmate Iverson in the strip cage after the waist chain restraints were applied by the officers.  He stated Inmate Iverson had good radial pulse in both hands as well as positive blanching in the fingernails indicating there was no circulation concerns regarding the application of the restraints. RN Ranker also stated he was able to place two fingers between the waist chain and the stomach area of Inmate Iverson.  Inmate Iverson did not indicate he had any medical complaints during his assessment of the restraints."

inmates who were housed in the RHU and in the JD cell block in 2008 or 2012 to establish that

the cells were extremely cold in the winter. [ECF Nos. 81-6, 81-7 and 81-8]. However, these

affidavits do not provide any indication as to the temperature of Plaintiff's cell for the relevant

days at issue, nor do they provide evidence that Defendants Albright or Leggett were aware that

Plaintiff was suffering ill effects as a result of his cell temperature. Furthermore, while

Plaintiff's medical records on the days in question reflect complaints about alleged injuries to his

arms, legs and chest wall, there is no indication that Plaintiff complained to medical personnel of

any ill effects resulting from temperature of his cell. [ECF No. 92-7]. Plaintiff claims

Defendants should have provided him blankets, but the record establishes that he had been

extracted from his cell twice that day for using a mattress and his suicide smock to cover his cell

window and had threatened suicide several times. Accordingly, he had lost privileges to items

that could be used for self-harm or to obscure visual access into his cell.

On January 12, 2010, Captain Leggett and Captain Berrier visited Plaintiff to "assess

whether he should be removed from restraints." [ECF No. 82-3]. According to Captain Leggett,

> Inmate Inverson was lying on the floor and refused to move, stating that he was "paralyzed". He had spoken to the officers prior to my arrival and was talking about self-harm. Though this is his usual method of drawing attention, Dr. Saavadra was contacted and spoke to the inmate at his cell. Since the inmate was asking for psych concerning self-harm issues, I felt that, combined with the fact that the inmate was just involved the day prior in a multiple extraction (Inmate Iverson had caused a seven man team to remove him from his cell 3 times for covering his window), that it was appropriate to extend the inmate for a second 24 hour period, which is permitted by policy. Major Zaken was notified of this fact. I did not in any way abuse this inmate. The inmate's actions were the sole reason the inmate was initially placed and then extended for a second 24 hour period. The inmate was then removed from these restraints (by me) on 1-13-2010.

[ECF No. 82-3].

Plaintiff contends that Captain Leggett's failure to obtain written approval for the second 24 hour application of restraints constitutes a violation of DOC Policy 6.5.1 and evidence of malicious intent. An investigation of this allegation was conducted, and it was determined that Captain Leggett had obtained verbal approval from Major Zaken "due to Inmate Iverson's threats of self-harm." [ECF No. 92-2, p. 24]. The evidence provided by Plaintiff also indicates that the use of restraints was continued after an evaluation by the facility psychologist. [ECF No. 82-1, p. 1; 82-3, p. 1].

On January 13, 2010, the waist restraints were removed. The removal was captured on video, which has been submitted to the Court. [ECF No. 92-6]. The video reflects that Plaintiff was able to stand, walk and follow directions and suffered no visible injuries. Plaintiff complained of stomach pain and was examined by medical staff. No apparent injuries were noted upon assessment. [ECF No. 92-7, p. 5]. While Plaintiff alleges that he had a bloody ring around his waist, it is clear from the video that his white t-shirt bears no blood stains and, after lifting his shirt, Plaintiff's skin is intact. Upon the removal of the restraints, Plaintiff was provided a mattress. The video camera continued to record Plaintiff while he shouted a request for court review of his situation and complained that his cell temperature was used by Defendants as a method of discipline. [ECF No. 92-6]. Plaintiff appears well and displays no signs of discomfort or ill effects as a result of the alleged cell temperature.

Plaintiff alleges that he was so cold, he was unable to eat. Plaintiff's records indicate, to the contrary, that he ate three meals on January 12, 2010, refused two meals and ate one meal on January 13, 2010, and ate two meals on January 14, 2010, the day after the restraints were removed. While Plaintiff did begin a hunger strike on January 15, 2010, medical staff were notified of his refusal to eat on January 17, 2010, and he was moved to the infirmary on January

18, 2010. Two days later, Plaintiff was returned to his cell and his records reflect that ate three meals a day. [ECF No. 92-2, pp. 62 – 66].

Plaintiff further complains that the use of metal chain waist restraints violates the Equal Protection Clause of the Fourteenth Amendment because softer Velcro restraints are now used at SCI – Fayette. Defendants respond that the use of Velcro restraints was implemented on February 1, 2010, after Plaintiff's incident. [ECF No. 92-10, ¶11].

### b. Retaliation claims against Defendant Tift.

Plaintiff also alleges a First Amendment retaliation claim against Defendant Tift arising out of his transfer from SCI – Fayette to SCI – Camp Hill on March 31, 2011, and placement in the Special Management Unit ("SMU") at SCI – Camp Hill. [ECF No. 92-5, p.16]. Plaintiff alleges that the transfer to another institution was retaliatory, as was the continuation of disciplinary measures in conjunction with his transfer, including the loss of use of a mattress and bedding. [ECF No. 49, ¶¶ 67, 74, 75, 77].

Defendants have provided evidence that Plaintiff's transfer was in an effort to improve Plaintiff's social skills so that he could be reintegrated into the inmate population. As of January 3, 2011, Plaintiff had been incarcerated for nearly 6 years. Because of his lengthy misconduct history, he had spent approximately 4.5 years in disciplinary custody, away from the general inmate population, and had acquired forced separations from inmates and staff members at two other facilities. Accordingly, staff at SCI – Fayette recommended that Plaintiff be transferred to SCI – Camp Hill so that he could participate in the "Accepting Responsibility" and "Violence Prevention" programs on an individual basis. He would also be afforded an opportunity to reintegrate into the general population through unit day room activities and gain work experience as a janitor. [ECF No. 92-4].

Plaintiff complains that disciplinary measures implemented at SCI – Fayette were continued at SCI – Camp Hill in retaliation for past grievances. In particular, Plaintiff complains that restrictions on bedding were maintained after his transfer. Defendants indicate that pursuant to DOC Policy 06.05.01, when an inmate is transferred to a different DOC facility, disciplinary restrictions imposed by the forwarding institution remain in place unless and until the receiving institution lifts them in response to improved inmate behavior. [ECF No. 92-10, ¶ 10]. This information was provided to Plaintiff in response to a grievance filed at SCI – Camp Hill when he was provided a "security blanket" in lieu of bedding and a mattress. As indicated in the response,

> [Plaintiff] "arrived from SCI – Fayette on 3/31/11 with four misconducts pending from that institution. With those misconducts, staff at SCI – Fayette placed you on restrictions, including bedding material. For that reason when you arrived at SCI – Camp Hill, you were placed in a cell and given a security blanket in place of a mattress. You were then seen by the hearing examiner on the pending misconducts, and when restrictions were lifted, you were provided a mattress by Camp Hill's SMU staff.

[ECF No. 92-5, p. 12]. Defendants contend that the continuation of disciplinary measures was not retaliatory, but in accordance with express DOC policy, and reasonably related to a legitimate penological interest implicated by Plaintiff's behavior.

### 3. Grievance History

Alternatively, Defendants contend that Plaintiff's failure to exhaust available administrative remedies prior to filing this action requires the entry of judgment in their favor in accordance with the requirements of the Prison Litigation Reform Act of 1985 ("PLRA"), 42 U.S.C. § 1997e(a). Defendants have provided copies of the grievances filed by Plaintiff with regard to each of his claims at issue and, with respect to each, have also provided the affidavit of Dorina Varner, the DOC Chief Grievance Officer, who states that Plaintiff has failed to fully

exhaust the DOC grievance procedure by seeking Final Review with the DOC Secretary's Office of Inmate Grievances and Appeals, as set forth in policy DC-ADM-804. [ECF No. 92-3]. In addition, Plaintiff's grievances failed to identify Defendant Tift as the cause of any harm alleged. [ECF No. 92-5].

Plaintiff responds that with regard to the incident of January 11-13, 2010, his initial grievance against Defendant Leggett (No. 303681) was responded to as a report of abuse pursuant to DOC policy DC-ADM 001, which provides an alternative mechanism for administrative review. [ECF 98-1, p. 10]. The investigation appears to have been resolved on March 2, 2010, with a confidential report that apparently was not provided to Plaintiff. [ECF No. 98-1, 15]. In addition, Plaintiff contends that his grievance against Defendant Albright (No. 304284) was fully exhausted either by his letters of appeal to the Facility Manager and the Chief Grievance Officer, or by filing complaints regarding the incident to the DOC Office of Professional Responsibility in compliance with DC-ADM 001. [ECF No. 98-1, pp. 13-14, 16-18]. Plaintiff, however, fails to address the issue of exhaustion of administrative remedies as to Defendant Tift and therefore seemingly concedes that the defense bars his claim against him.

### B.    STANDARD OF REVIEW

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir.1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir.1990) (quoting Anderson, 477 U.S. at 251– 52).

If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable ... or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249–50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. See Fed.R.Civ.P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv–A–Portion, Inc., 909 F.2d 1524, 1542 (3d Cir.1990).

## C.    DISCUSSION

### 1. Excessive Force Claim

Plaintiff alleges that Defendants' use of chain waist restraints constitutes a violation of his Eighth Amendment rights against cruel and unusual punishment. The cruel and unusual punishments clause "was designed to protect those convicted of crimes" and, thus, prohibits the

"unnecessary and wanton infliction of pain" on prisoners in the custody of the state. An Eighth Amendment violation will be found where the punishment at issue serves "no legitimate penological interest." See Ingraham v. Wright, 430 U.S. 651, 664 (1977); Rhodes v. Chapman, 452 U.S. 337, 345-346 (1981).

Courts, however, generally defer to the judgment and policies of prison officials who are charged with maintaining internal order and discipline and often must make snap decisions in volatile and dangerous situations. Hudson v. McMillian, 503 U.S. 1, 6 (1992). Officials must balance the threats presented by prison unrest to prison workers, inmates and administrators "against the harm inmates may suffer if guards use force." Id. Because of these competing concerns, the standard to measure the propriety of the use of force by prison authorities is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000)(citing Hudson, 503 U.S. at 7). To resolve the inquiry, courts are to consider:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009).

With respect to the first factor -- the need for the application of force -- Plaintiff cannot dispute that his escalating misconduct, repeated attempts to cover his cell window and threats of self-harm led to the need for the application of restraints on January 11, 2010. Given his behavior, other than leaving him naked in a completely bare cell, no other options remained.

As to the second factor, it appears that Defendants used no more force than was necessary to gain control over Plaintiff and defuse an escalating and evidently repeated situation – and this

minimal use of force is amply supported by the video recording. [ECF No. 92-6]. The use of

waist restraints occurred solely because Plaintiff repeatedly covered his cell observation window

with any and all available items and threatened self-harm. After using the suicide smock to

cover his window and threatening to "fish" a razor to "finish the job," Defendants were left with

the option of leaving Plaintiff naked, or permitting clothing but restraining his hands so that he

could no longer obscure surveillance. Plaintiff was not assaulted by any officer, but was

restrained in an orderly manner to take physical control of his body to prevent harm. Plaintiff

repeatedly contends that his claim arises out of the "tight" application of restraints so as to cause

permanent scarring, discomfort and an inability to breathe. However, Plaintiff provides no

evidence of injury or that the restraints were applied to cause harm. As such, consideration of the

second factor -- the relationship between the need and the amount of force that was used --

suggests that no excessive force was used.

      As to the third factor -- the extent of injury inflicted – again, the record shows that

repeated medical assessments were conducted throughout the 48-50 hours Plaintiff was

restrained and contrary to his allegations, Plaintiff did not suffer any injury and no treatment was

necessary. In fact, not only does the video recording of the removal of Plaintiff's restraints

corroborate medical assessments, Plaintiff cannot point to any evidence that indicates he

sustained an injury. Thus, while not dispositive standing alone, the fact that Plaintiff did not

suffer a discernible injury suggests that the force utilized by Defendants was not excessive.

      Nor does consideration of the fourth factor suggest that excessive force was used by

Defendants, because it was more than reasonable for Defendants to perceive a threat to

Plaintiff's safety under the circumstances. Defendants have not only presented evidence of

Plaintiff's extensive history of self-harm and assaultive behavior, but it is undisputed that

Plaintiff was repeatedly non-compliant and increasingly belligerent. Given Plaintiff's verbal threats of self-harm by any available means, it is quite plausible that Defendants' decision to restrain Plaintiff over the entire 48-50 hours period prevented injury.

As to the fifth and final factor, Defendants appear to have made reasonable efforts to temper the severity of force in responding to Plaintiff's disturbing and disruptive behavior. The record demonstrates that Defendants implemented the least invasive behavioral control method possible after Plaintiff initially refused to cooperate with a cell search, and then covered his cell window on two immediately successive occasions while repeatedly threatening self-harm. It was Plaintiff's failure to comply with appropriate prison regulations, coupled with his stated intention to gain possession of a weapon that necessitated further action by Defendants. This evidence demonstrates that Defendants' actions in taking control of Plaintiff's body, searching and then placing him in chain waist restraints was designed to defuse an escalating situation that, given Plaintiff's remarkable history of misconduct, could have impacted not only his own safety, but the safety of officers responding to each of his calls for attention.

It follows that the force used to place Plaintiff in restraints was applied in a good-faith effort to restore and maintain discipline and, thus, designed to serve a legitimate penological interest. Moreover, Plaintiff has not offered any evidence which would suggest that Defendants applied any more force than necessary or that the force used was applied maliciously and sadistically to cause harm. Indeed, the video recording demonstrates that each phase of the incident was handled by DOC officials professionally, in near silence, and that Plaintiff's assertions to the contrary, he suffered no ill-effects. No reasonable juror could find that Defendants' use of force was excessive or in violation of the Eighth Amendment's prohibition

against cruel and unusual punishment. Defendants, therefore, are entitled to summary judgment as to Plaintiff's Eighth Amendment excessive use of force claim.

### 2. Conditions of Confinement Claim

Plaintiff also alleges that Defendants violated his Eighth Amendment rights by placing him in "tight" waist restraints and handcuffs for 48 – 50 hours, dressed in shorts and a t-shirt and boxers in a freezing cold cell.[3] The Eighth Amendment's prohibition on "cruel and unusual punishment" imposes a duty on prison officials to provide "humane conditions of confinement." Betts v. New Castle Youth Development Center, 621 F.3d 249, 256 (3d Cir. 2010), quoting, Farmer v. Brennan, 511 U.S. 825, 832 (1994). That is, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). For an alleged deprivation to rise to the level of an Eighth Amendment violation, it must "result in the denial of 'the minimal civilized measure of life's necessities.'" Id. at 835.

To prove an Eighth Amendment violation, two requirements must be met:

The inmate must show that: 1) he suffered a risk of "serious" harm; and 2) prison officials showed "deliberate indifference" to such risk. Id., 511 U.S. at 834. The first element is satisfied when the alleged "punishment" is "objectively sufficiently serious." Id. In determining whether a prisoner has alleged a risk that is objectively serious, a court must consider not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. Helling v. McKinney, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed.2d 22 (1993). The second criterion, deliberate indifference, requires an inmate to show that the prison official had a sufficiently culpable state of mind.

The Supreme Court clarified this deliberate indifference standard in Farmer as follows.

---

[3] Plaintiff's shoes were removed after his walk outside to transfer him to a POC cell.

We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation.... But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment. Farmer, 511 U.S. at 837–838 (emphasis added).

Norris v. Davis, No. 10-1118,  2011 WL 1627340 * 3 (W.D. Pa. 2011).  The question of Defendants' deliberate indifference is a subjective inquiry, while risk of harm is evaluated objectively. See Atkinson v. Taylor, 316 F.3d 257, 262 (3d Cir. 2003).  Thus, even if his conditions were objectively harsh, Plaintiff must point to evidence upon which a reasonable jury could conclude that the prison authorities acted with "deliberate indifference" to those conditions. Burkholder v. Newton, 116 F. App'x 358, 363 (3d Cir. 2004); Farmer, 511 U.S. at 833; Wilson, 501 U.S. at 297; Rhodes v. Chapman, 452 U.S. 337, 347 (1981). This requires a court to determine, subjectively, whether evidence exists that Defendants acted with a sufficiently culpable state of mind. Id. The deliberate indifference standard has been defined as requiring that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

With regard to the facts presented in the case at issue, the use of restraints does not itself violate the constitution. See Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (prisoner

who was restrained in handcuffs and shackles for twenty-four hours, making it more difficult for him to relieve himself, did not suffer a constitutional violation). "Restraints on an inmate do not violate the [eighth] amendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'" See Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984) (quoting Rhodes v. Chapman, 452 U.S. 337, 346 (1981)).

Accordingly, Plaintiff claims a constitutional violation arising out of the combined use of "tight" restraints with the allegedly cold temperature of his cell.   However, Plaintiff has offered no evidence indicating that he faced a substantial risk of harm that was deliberately disregarded by Defendants Leggett and Albright.

First, the length of time Iverson spent restrained was the result of his own ongoing combative behavior, threats of self-harm and refusal to follow prison regulations regarding prohibitions on blocking cell windows. The need for restraints was re-evaluated by Defendant Leggett after 24 hours and was continued because Plaintiff remained noncompliant with directions.  The restraints were removed once Plaintiff remained calm and compliant and was no longer seeking attention by threatening suicide.  At that point, he no longer appeared to present a risk to himself or others and release was appropriate.  Upon release, Plaintiff was able to stand and walk, and calmly await removal of the restraints, having suffered no apparent harm.  Plaintiff contends that because his medical records show that he was calm during most of the ten examinations by medical staff, the length of restraint was unconstitutionally excessive. However, as is indisputably demonstrated by the video evidence, given Plaintiff's behavior before the restraints were applied, and his repeated escalation of misconduct and threats of self-

harm for the purpose of gaining attention after each intervention, the length of application of restraints cannot reasonably be found to be excessive.

Second, while restrained, Plaintiff was continuously monitored by medical staff, who did not note any evidence of harm during or in the hours subsequent to Iverson's release from the restraints. [ECF Nos. 92-2, pp. 77-84; 92-7, pp. 1-5]. Plaintiff's medical records confirm that Plaintiff's pulse and capillary function were normal throughout the period of confinement, and his extremities were repeatedly checked to ensure that the restraints did not restrict blood flow. Moreover, there is no evidence that Plaintiff complained of any physical effects suffered because of the temperature of his cell. While Plaintiff contends that he continuously complained that the restraints were "tight," restricting his ability to breathe comfortably and causing intense pain, there is no evidence to support his claims. Based upon his medical records, the video evidence provided to the Court and Plaintiff's grievances, there simply is no evidence to establish that the conditions "posed a substantial risk of serious harm." Farmer, 511 U.S. at 834.

Further, there is no evidence that Defendants were aware of the alleged inadequacy of the heating system in Plaintiff's cell and deliberately disregarded any risk presented by such conditions. The affidavits submitted by Plaintiff in support of his allegations regarding the freezing temperature of his cell do not aid his claim. First, the affidavits fail to establish the temperature of Plaintiff's cell on January 11-13, 2010; second the affidavits fail to establish that the heating system was malfunctioning on the relevant dates so as to create a danger to Plaintiff; and third, the affidavits fail to establish that either Defendant Leggett or Defendant Albright knew Plaintiff was cold and disregarded his complaints. Plaintiff therefore has failed to present evidence sufficient to raise a genuine issue of material fact with regard to deliberate indifference on the part of either Defendant Albright or Defendant Leggett.

Plaintiff points to <u>Inmates of Allegheny County Jail v. Wecht</u>, 565 F. Supp. 1278, 1284 (W.D. Pa. 1983), as support for the proposition that the application of restraints in a stripped cell without a blanket is per se unconstitutional. However, at issue in <u>Wecht</u> was the use of a four-point metal cot with handles to which arm and leg restraints could be attached. Inmates so confined were partially or totally stripped of clothing and left to lie in their own waste. The Court objected to the failure to provide a mattress and clothing because inmates so restrained "obviously cannot tear at their clothes or use them for suicide purposes." <u>Id.</u> at 1285. In this case, however, Plaintiff was free to ambulate, was clothed in a t-shirt and shorts, and had sufficient arm movement to permit him to relieve himself using a toilet. Given Plaintiff's ability to stand, walk and use his hands, the decision not to provide a blanket which could be used to again block a cell window or used for suicide purposes was reasonable and did not subject Plaintiff to a substantial risk of harm. <u>See</u>, <u>e.g.</u>, <u>Mohamad v. Barone</u>, 494 F. App'x 212, 214 (3d Cir. 2012) (summary judgment affirmed; confinement to restraint chair, deprived of clothing apart from a sheet, does not violate Eighth Amendment where continual medical monitoring shows no harm, unrestricted blood flow, normal cardiovascular function).

Based upon the clear record before the Court, Plaintiff has not met his burden to come forward with specific facts showing a genuine issue for trial and entry of summary judgment in favor of Defendants is appropriate. Fed. R.Civ.P. 56(e).

### 3. Equal Protection Claim

To bring a successful equal protection claim under Section 1983, a plaintiff must prove the existence of purposeful discrimination, and demonstrate that he was treated differently from similarly situated individuals. <u>See</u> <u>Washam v. Klopotoski</u>, 403 F. App'x 636, 638 (3d Cir. 2010)

(citing <u>Keenan v. City of Phila.</u>, 983 F.2d 459, 465 (3d Cir. 1992); <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1478 (3d Cir. 1990)).

Plaintiff alleges that his rights to equal protection under the law have been violated by the tight application of metal chain waist restraints instead of softer Velcro waist restraints. It is undisputed, however, that the DOC implemented the use of Velcro restraints on February 1, 2010, weeks after Plaintiff's incident. [ECF No. 92-10].   Plaintiff has not presented any evidence that as of January 11, 2010, DOC inmates requiring waist restraints were placed in anything other than a metal chain restraint.  Because DOC's use of Velcro restraints began *after* Plaintiff's incident, Plaintiff cannot demonstrate that as of the date of his incident, he was treated differently by Defendants Albright and Leggett from any other similarly situated inmate in their custody.  Further, Plaintiff has not presented any evidence regarding the method of application of waist restraints to any other inmate so as to create an equal protection claim arising out of the allegedly "tight" application of restraints on the days in question. The undisputed facts make it clear that Plaintiff's equal protection claim fails as a matter of law and Defendants' Motion for Summary Judgment should be granted.

### 4. Retaliation by Defendants Albright and Leggett

Plaintiff alleges that his placement in waist restraints from January 11-13, 2010, was an act of retaliation arising out of past grievances filed by Plaintiff against Defendant Albright.   In order to establish a prima facie retaliation claim, a plaintiff must show three requisite elements: (1) that the conduct in which he engaged was constitutionally protected; (2) that he suffered "adverse action"[4] at the hands of prison officials; and (3) that his constitutionally protected

---

[4] An adverse action is one "sufficient to deter a person of ordinary firmness from exercising his rights." <u>Verbanik v. Harlow</u>, No. 09-448, 2012 WL 4378198 (W.D. Pa. Sept. 25, 2012) (quoting, <u>Bailey v. Lawler</u>, No. 07–2058, 2010 WL 5018825 (M.D. Pa. Aug. 11, 2010)).

conduct was a substantial motivating factor in the defendants' conduct. <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001) (*adopting* <u>Mount Healthy Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)). The crucial third element, causation, requires a plaintiff to prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. <u>See</u> <u>Lauren W. ex rel. Jean W. v. DeFlaminis,</u> 480 F.3d 259, 267 (3d Cir. 2007); <u>Krouse v. American Sterilizer Co</u>., 126 F.3d 494, 503–04 (3d Cir. 1997)). Once a plaintiff has made out a prima facie case, the burden then shifts to the defendant to prove by a preponderance of the evidence that he or she "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." <u>Rauser</u>, 241 F.3d at 334 (incorporating <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)); <u>Verbanik v. Harlow</u>, No. 09-448, 2012 WL 4378198 (W.D. Pa. Sept. 25, 2012).

With particular relevance to Plaintiff's claims for retaliation, unsupported allegations are insufficient to establish a claim. A party opposing summary judgment must come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp.2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>See</u> <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 250–57(1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 587–89 (1986); <u>see</u> <u>also</u> Fed. R. Civ. P. 56(c), (e).

Plaintiff claims that Defendant Albright retaliated against him because of grievances filed by Plaintiff charging Albright with abuse; in particular, a grievance filed in 2008 against Defendant Albright for hurting his hand while closing a cell wicket. [ECF No. 82, 82-4 and 82-5]. However, Plaintiff has failed to meet his burden of producing evidence to infer retaliatory

motive, sufficient to create a genuine issue for trial. Mincy v. Klem, No. 07-0790, 2012 WL 727591 (M.D. Pa. Mar. 6, 2012).

First, even assuming that Plaintiff's complaints were protected speech, he has presented no evidence that his placement in waist restraints occurred in retaliation for past grievances as required to sustain a retaliation claim. See Rauser, 241 F.3d at 333. While Plaintiff attempts to tie his 2008 grievance of abuse to the disciplinary measures imposed, there is no record evidence supporting Plaintiff's speculative theories.

In some instances, circumstantial evidence such as a temporal proximity between a protected act and an adverse action may suffice to indicate retaliatory conduct or motive. See, e.g., Westefer v. Snyder, 422 F.3d 570, 584 (7th Cir. 2005); Thaddeus–X, 175 F.3d at 399. However, timing alone will not create a material issue of fact, as the mere occurrence of an adverse action after a grievance is filed is relevant, but not dispositive. Booth v. King, 228 F. App'x 167, 172 (3d Cir. 2007) (while timing of the incidents appears suspicious, this alone does not create a showing of retaliation); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds by Burlington Northern and Santa Fe Ry. Co., 548 U.S. 53, 60-64 (2006) (if "timing alone" is the evidence adduced to establish the element of causation in a retaliation claim, the facts must be "unusually suggestive" of retaliatory motive).

Here, Plaintiff has not, and cannot, establish temporal proximity between his prior grievances and the alleged retaliatory conduct. First, nearly two years had passed between the grievance filed by Plaintiff against Defendant Albright and the incident at issue. Second, even if Plaintiff's speculation, coupled with some temporal proximity gave rise to an inference of retaliatory motive, "[o]nce a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still

prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." <u>Rauser</u>, 241 F.3d at 334. In determining whether the proffered justification is sufficient, "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979).

The uncontroverted evidence establishes that Plaintiff's placement in restraints was related to the legitimate goal of restoring order and discipline with an inmate who continued to disobey prison regulations and who escalated an initial refusal to permit a cell search into an incident requiring three cell extractions, strip searches, the removal of a mattress, the removal of a "suicide" smock and the eventual use of waist restraints.

Defendants have provided evidence that regardless of Plaintiff's past grievances regarding the 2008 cell wicket incident, he would have been restrained because of his continued threats of self-harm and repeated refusal to obey regulations. Accordingly, Defendants have met their burden of showing that Plaintiff was restrained for reasons reasonably related to legitimate penological interests. <u>See</u> <u>Grunthal v. Tempus</u>, No. 09–1338, 2010 WL 4639049, at *7 (W.D. Pa. Nov. 8, 2010) ("Although Plaintiff disagrees with the factual findings of the hearing examiner, they were upheld after pursuing all levels of review. Thus, Defendants have established that the same action would have been taken in the absence of any protected activity for reasons related to the legitimate penological goal of maintaining order in the institution.").

In the absence of evidence beyond Plaintiff's own speculation that his constitutionally protected conduct was a substantial motivating factor in any alleged act of retaliation, Plaintiff has failed to present a genuine issue of material fact requiring jury resolution and Defendants'

Motion for Summary Judgment should be granted. See, Brooks v. DiGuglielmo, Civ. No. 05-4588, 2008 WL 5187529, at *13 (E.D. Pa. Dec. 9, 2008) ("A plaintiff must come forward with more than general attacks upon the defendants' motivations and must produce affirmative evidence of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive.") (citations omitted).

### 5. Retaliation claim against Defendant Tift

Plaintiff alleges that "on March 31, 2011, the retaliatory decision was made by defendants (Supt. Coleman) and other named defendants to send the plaintiff to the SMU at SCI Camp Hill." [ECF No. 49, ¶ 74]. Plaintiff alleges that in conjunction with his transfer, Defendant Tift further retaliating by forwarding a list of all disciplinary restrictions in place at SCI – Fayette. Id. at ¶¶ 66, 74, 75. In particular, Plaintiff alleges that Defendant Tift "sent Camp Hill a clear order to take the plaintiff's mattress away." Id. at ¶ 77.

Defendants have responded to Plaintiff's claims, stating that the retention of disciplinary restrictions was conducted pursuant to DOC Policy 06.05.01 and served a legitimate penological interest to encourage Plaintiff's appropriate behavior. In this case, it is clear that Plaintiff's misconduct history and recalcitrant behavior, evidenced in the video submitted to the Court, left administrators with few options to encourage his compliance with basic rules in place for the safety of inmates and staff alike.

As cogently summarized by Defendants, the record leaves no doubt as to the legitimate penological interests served by both Plaintiff's transfer and the continuation of certain disciplinary measures. First, the decision to transfer Plaintiff to SCI – Camp Hill served to provide Plaintiff particular individualized programming and counseling so that could he could begin to reintegrate with the general prison population. [ECF No. 92-4]. As made clear by the

referral committee, Plaintiff's restricted disciplinary housing placement at SCI – Fayette did not provide sufficient incentive for Plaintiff to consistently adhere to DOC rules and regulations and, given his lengthy sentence, it is certainly within the province of the prison administration to provide programming with the hope of positively influencing Plaintiff's behavior going forward. [ECF No. 92-4].  See, e.g., DeFranco v. Wolfe, 387 F. App'x 147, 157 (3d Cir. 2010).  Second, the temporary continuation of Plaintiff's disciplinary measures upon transfer, including the withholding of a mattress and bedding, served the legitimate interest of ensuring Plaintiff's inability to misuse these items and to retain their status as a privilege which could be restored by the receiving institution upon a demonstration of appropriate behavior.  [ECF 92-10, ¶ 10].

Furthermore, Plaintiff has presented no evidence that his transfer and/or the continuation of disciplinary measures were motivated by his exercise of a constitutional right.  Plaintiff points to no particular grievance or suit upon which Defendant Tift acted and so has not established a prima facie retaliation claim.  However, had Plaintiff presented evidence that some protected activity motivated the transfer or continuation of disciplinary measures, prison officials may still prevail by establishing that they would have made the same decision absent Plaintiff's protected conduct for reasons reasonably related to the a legitimate penological interest.  Rauser, 241 F.3d at 334.  Here, Defendants have provided sufficient evidence of the basis for both the decision to transfer Plaintiff and the decision to initially continue disciplinary restrictions so as to be within the "broad discretion" afforded prison officials.   Accordingly, there is no genuine issue of material fact that such measures were "reasonably related to legitimate penological interests" and the Motion for Summary Judgment on behalf of Defendant Tift should be granted.

### 6. Failure to Exhaust Administrative Remedies

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir.2000). It has been made clear that the exhaustion requirement is mandatory. See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

Defendants have provided each of Plaintiff's relevant grievances as well as the affidavit of Donna Varner, Chief Grievance Officer for the DOC. [ECF Nos. 92-3, 92-5]. The Varner affidavit explains that DC-ADM 804 establishes a grievance system that applies to all state correctional institutions and provides three levels of review: 1) initial review by the facility grievance coordinator; 2) appeal of initial review to the superintendent or regional director; and 3) final appeal to the Secretary's Office of Inmate Grievances and Appeals. [ECF No. 92-3]. Varner further states that her review of Plaintiff's grievance records reveals that while Plaintiff did file grievances for initial review with regard to many of his claims, he did not seek final appeal to the Secretary's Office as to any of his claims at issue. Id. Examination of the relevant grievances establishes that Plaintiff has not filed a proper grievance with respect to his claims

against Defendant Tift, and thus did not exhaust his administrative remedies as to him. [ECF No. 92-5].

Plaintiff has not explained his failure to comply with the established grievance procedure with regard to Defendant Tift and, accordingly, must concede that his claims against him were not properly exhausted. See Spruill v. Gillis, 372 F.3d 218, 227 (3d Cir. 2004) ("exhaustion is a prerequisite to suit ... for all actions brought with respect to prison conditions"); see also Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003) (discussing the time constraints for curing exhaustion issues). Defendants are therefore entitled to the entry of judgment in their favor on this alternative basis as to Defendant Tift.

With regard to Defendants Albright and Leggett, however, Plaintiff proffers evidence of the DOC investigation of his claims of abuse pursuant to the alternative grievance procedure provided by DC-ADM-001 and contends that his report is sufficient to exhaust available remedies. Administrative review through the DC-ADM-001 process has been held sufficient to overcome a motion for summary judgment. See, Victor v. SCI Smithfield, No. 08–1374 at *9– 11 (M.D. Pa. Aug.12, 2011) (Nealon, J.) (denying summary judgment on exhaustion grounds because the plaintiff had filed a letter with the OPR regarding abuse and the record contained contradictory reports as to when the investigation on the complaint was completed); McKinney v. Zihmer, No. 01–2088, 2010 WL 1135722 at *7 (M.D. Pa. Mar.23, 2010) (Rambo, J.) (denying summary judgment where prisoner claimed that he had complied with the exhaustion requirement by way of DC–ADM 001); Carter v. Klaus, No. 05–1995, 2006 WL 3791342 at *3 (M.D. Pa. Dec. 22, 2006) (Caldwell, J.) (denying defendants' motion for summary judgment on exhaustion grounds because the plaintiff pursued a complaint to the OPR under DC–ADM 001, "the only step he had to take under that policy"). Here, given the recommendation that summary

judgment be entered in the favor of all Defendants on the merits of Plaintiff's claims against them, the Court need not reach this issue.

### 7. Plaintiff's State Law Claims

With the recommendation that judgment be entered in favor of Defendants as to each of Plaintiff's Section 1983 claims, it is further recommended that the court decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims for assault and intentional infliction of emotional distress and, further, that the state law claims be dismissed without prejudice. See, 28 U.S.C. § 1367(c)(3); Kach v. Hose, 589 F.3d 626, 650 (3d Cir. 2009); Jacobs v. Bayha, No. 07-237, 2010 WL 3895768 (W.D. Pa. Sept. 30, 2010).

### D.    CONCLUSION

For the foregoing reasons, is respectfully recommended that Defendants' Motion for Summary Judgment [ECF No. 89] be granted and that Iverson's Motion for Partial Summary Judgment [ECF No. 80] be denied. It is further recommended that Plaintiff's state law claims be dismissed without prejudice.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Objections are to be submitted to the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing

objections may file their response to the objections within fourteen (14) days thereafter in

accordance with Local Civil Rule 72.D.2.

Respectfully submitted,


/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: July 3, 2013


cc:     The Honorable Terrence F. McVerry
        United States District Judge

        All counsel of record by Notice of Electronic Filing

        David Iverson
        GE-2064
        SCI Pittsburgh
        P.O. Box 99991
        Pittsburgh, PA 15233